# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3884

_____

Douglas B. Stalley, on behalf of the    *
United States of America,    *
   *
     Plaintiff/Appellant,    *
   *
     v.    *
   *
Catholic Health Initiatives, a Colorado    *
Corporation; Bergen Mercy Foundation,    *
Inc., a Nebraska corporation; Alegent    *
Health-Bergen Mercy Health System, a    *
Nebraska corporation; Alegent Health,    *
a Nebraska corporation; Preferred    *
Professional Insurance Company, a    *
Nebraska corporation; Advocate    *
Insurance Resources SPC, a Cayman    *
Islands company,    *
   *
     Defendants/Appellees.    *

_____

No. 06-4121

_____

Appeals from the United States
District Court for the Eastern
District of Arkansas.

Douglas B. Stalley, on behalf of the    *
United States of America,    *
   *
     Plaintiff/Appellant,    *
   *
     v.    *
Triad Hospitals, LLC, a Delaware    *

limited liability company; Triad         *
Hospitals, Inc., a Delaware Corporation; *
Triad Hospitals Holdings, Inc., a        *
Delaware corporation; Parthenon          *
Insurance Company, Limited, a            *
Bermuda company; Health Midwest          *
Insurance Company, Limited, a Cayman     *
Islands company; Health Care             *
Indemnity, Inc., a Colorado corporation, *
                                         *

      Defendants/Appellees.

_____

Submitted: May 17, 2007
Filed: November 27, 2007 (Corrected 12/20/07)

_____

Before WOLLMAN, BRIGHT, and JOHN R. GIBSON, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

In these two consolidated appeals we consider whether a plaintiff who has alleged no injury to himself has standing to bring suit under the Medicare Secondary Payer statute, 42 U.S.C. § 1395y(b)(3)(A). Because we conclude that the suit authorized by the statute is a private cause of action, which requires the plaintiff to have standing in his own right, rather than a qui tam statute, which allows the plaintiff to assert injury to the United States, we affirm the district courts'[1] dismissal of these cases.

_____

[1] The district judge in Stalley v. Catholic Health Initiatives, No. 06-3884, was the late Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas. The district judge in Stalley v. Triad Hospitals, No. 06-4121, was the Honorable William R. Wilson, United States District Judge for the Eastern District of Arkansas.

Both of these cases were filed by the same plaintiff, Douglas B. Stalley, who has also filed many similar cases around the country.[2] Stalley alleges that the defendants Catholic Health Initiatives[3] and Triad Hospitals, Inc.[4] are medical care providers participating in the Medicare program, who partly self-insure for malpractice. He alleges that the insurance company defendants[5] were subsidiaries or sister companies to the provider defendants and wrote malpractice insurance for the provider defendants.

Stalley's substantive allegations are substantially the same in the two suits before us:

> On numerous occasions, [the provider defendants] by and through [their] employees and agents, caused harm to Medicare recipients who were patients in [the defendants'] hospitals, thereby triggering legal obligation on the part of [the hospital defendants] and the other primary payer Defendants herein to pay for any consequential medical service, treatment, or medication. Nevertheless, [the provider defendants] provided medical services, treatment, and medication to such Medicare recipients who were harmed by [the provider defendants'] own conduct,

---

[2]Erin Brockovich has filed a number of similar cases in California.

[3]Stalley also lists Bergen Mercy Foundation, Inc., Alegent Health-Bergen Mercy Health System, Alegent Health as provider plaintiffs, but refers to these together with Catholic Health Initiatives as "CHI."

[4]Stalley also lists Triad Hospitals LLC and Triad Hospital Holdings, Inc. as provider plaintiffs, but refers to these defendants together with Triad Hospitals, Inc. as "Triad."

[5]In the Catholic Health Initiatives case, the insurer defendants are Preferred Professional Insurance Company and Advocate Insurance Resources, SPC. In the Triad case, the insurer defendants are Parthenon Insurance Company, Limited, Health Midwest Insurance Company, Limited, and Health Care Indemnity, Inc.

and thereafter received reimbursement from Medicare for treating those injured Medicare recipients.

The complaints allege that the insurer defendants knew that the provider defendants had injured the Medicare beneficiaries and that the insurer defendants were liable as primary payers, yet the insurer defendants did not reimburse Medicare for the costs of treatment. The complaint does not allege that Stalley was either a Medicare beneficiary or a patient of the defendants or that he was injured by the defendants in any way. For that matter, the complaint does not identify any particular person who was injured by the defendants at any particular time.

The defendants in both cases moved to dismiss for lack of jurisdiction and for failure to state a claim. Both district courts granted the motion. The district court in the Catholic Health Initiatives case ruled first, holding that Stalley lacked constitutional standing to bring the suit because he had not alleged any injury to himself. Stalley v. Catholic Health Initiatives, 458 F. Supp. 2d 958, 962-63 (E.D. Ark. 2006). Stalley contended that he had standing because he asserted injury to the United States and the Medicare Secondary Payer statute was a qui tam statute that authorized him to bring suit as relator for the United States. The district court examined the Medicare Secondary Payer statute and found no support for the notion that it was a qui tam statute. Id. at 963. Accordingly, the court dismissed Stalley's suit under Fed. R. Civ. P. 12(b)(1) for lack of standing. Alternatively, the court held that Stalley had not alleged a cause of action under 42 U.S.C. § 1395y(b)(3)(A) because he had not alleged that the provider defendants' liability had been "demonstrated," and the duty of the primary insurer to pay or to reimburse Medicare did not arise until the tortfeasor's liability has been "demonstrated" by judgment or other comparable means. Id. at 964 (relying on Glover v. Liggett Group, Inc., 459 F.3d 1304, 1309 (11th Cir. 2006)). The district court in Triad relied on Judge Howard's conclusion in Catholic Health

Initiatives that § 1395y(b)(3)(A) is not a <u>qui tam</u> statute and that Stalley therefore lacked standing to sue.[6]

The standard of review of a district court's decision under Fed. R. Civ. P. 12(b)(1) depends on whether the district court resolved a facial attack or a factual attack on subject matter jurisdiction. <u>Osborn v. United States</u>, 918 F.2d 724, 729 n. 6 (8th Cir. 1990). If, as here, the district court addressed a deficiency in the pleadings, our standard of review is the same standard we apply in Rule 12(b)(6) cases. <u>Mattes v. ABC Plastics, Inc.</u>, 323 F.3d 695, 697-98 (8th Cir. 2003). We accept as true all factual allegations in the complaint, giving no effect to conclusory allegations of law. <u>Id.</u> at 698. The plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right. <u>See</u> <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1964-66 (2007).

The party invoking federal jurisdiction has the burden of establishing that he has standing to assert the claim. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992). Standing consists of three elements: the plaintiff must have suffered an injury in fact; there must be a causal connection between that injury and the conduct complained of; and it must be likely that the injury would be redressed by a remedy the court could order. <u>Id.</u> at 560-61. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a

---

[6]An incomplete list of other district court cases dismissing Stalley's or Brockovich's § 1395y(b)(3)(A) claims for lack of standing includes <u>Stalley v. Orlando Regional Healthcare Systems, Inc.</u>, No. 06-1824 (M.D. Fla. Jan. 22, 2007); <u>Stalley v. Methodist Healthcare</u>, No. 06-2605 (W.D. Tenn. Dec. 22, 2006); <u>Brockovich v. Loma Linda University Medical Center</u>, No. 06-0834 (C.D. Cal. Nov. 15, 2006); <u>Brockovich v. Healthplus Corp.</u>, No. 06-5660 (C.D. Cal. Nov. 15, 2006); <u>Brockovich v. Scripps Health</u>, No. 06-1569 (S.D. Cal. Nov. 7, 2006). The defendants advise us that no court has held that Stalley or Brockovich have standing to assert these claims.

motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." Id. at 561 (internal quotation marks omitted).

Stalley does not contend that he himself has sustained any injury in fact. Instead, he contends that the Medicare Secondary Payer statute is a qui tam[7] statute. A qui tam statute effectively assigns part of the government's interest to a relator so that the relator has standing to assert an injury suffered by the government. See Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 772-74 (2000). ("The [False Claims Act] can reasonably be regarded as effecting a partial assignment of the Government's damages claim. . . . We conclude, therefore, that the United States' injury in fact suffices to confer standing on respondent Stevens.") Qui tam actions developed around the end of the thirteenth century as a way for individuals who had suffered harm to avail themselves of the royal courts by pleading a harm to the King as well as to themselves. Id. at 774-75. Well before American independence, the action evolved into the modern form in which informers who had not suffered harm personally, but who knew of harm done to the government, were authorized by statute to sue the wrongdoer on the government's behalf and to retain a portion of the damages awarded the government as a "bounty" or reward for bringing the wrongdoing to light. Id. at 775-77. "There presently is no common-law right to bring a qui tam action, which is strictly a creature of statute." United Seniors Ass'n v. Philip Morris USA, 500 F.3d 19, 23 (1st Cir. 2007); accord United States ex rel. Burnette v. Driving Hawk, 587 F.2d 23, 24 (8th Cir. 1978). The best known qui tam statute today is the False Claims Act, 31 U.S.C. §§ 3729-3732, which conferred standing on the plaintiff in Vermont Agency of Natural Resources, 529 U.S. at 778.

---

[7]"Qui tam is short for the Latin phrase qui tam pro domino rege quam pro se ipso in hac parte sequitur, which means 'who pursues this action on our Lord the King's behalf as well as his own.'" Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 768 n.1 (2000).

The plain language of § 1395y(b)(3)(A) says, "There is established a private cause of action for damages . . ." (emphasis added). A "private" right is different from a public right, see Black's Law Dictionary, "Right" (8th ed. 2004) (private right is defined as "A personal right, as opposed to a right of the public or the state."), and qui tam cases exist to vindicate public rights. Thus, the Medicare Secondary Payer statute purports to give a substantive right to individuals qua individuals, not as private attorneys general or assignees of a public right. In contrast, the False Claims Act qui tam provision authorizes a private person to bring a civil action "for the person and for the United States Government. The action shall be brought in the name of the Government." 31 U.S.C. § 3730(b). Moreover, the Medicare Secondary Payer statute lacks any provisions giving the government the right to control the action, such as the right to dismiss the action, the right to veto a dismissal or settlement, and the right to review the complaint in camera before the relator serves the complaint on the defendant. Again, in contrast, the False Claims Act has extensive provisions giving the government these rights and more. See 31 U.S.C. § 3730. The absence of procedural safeguards giving the executive branch control over the prosecution of the action and the proceeds is powerful evidence that Congress did not mean § 1395y(b)(3)(A) to function as a qui tam statute. See United Seniors Ass'n, 500 F.3d at 24-25 (affirming dismissal for lack of standing of Medicare Secondary Payer private action by plaintiff who had no personal injury); In re Guidant Corp. Implantable Defibrillators Prods. Liability Lit., 484 F. Supp. 2d 973, 980-81 (D. Minn. 2007) (dismissing Medicare Secondary Payer private action for lack of standing), reconsidered on different grounds, 2007 WL 2028137 (D. Minn. May 9, 2007).

Stalley relies on a statement in Mason v. American Tobacco Co., 212 F. Supp. 2d 88, 94 (E.D.N.Y. 2002), aff'd, 346 F. 3d 36 (2d Cir. 2003), that the private right of action provided by § 1395y(b)(3)(A) is "similar to a qui tam action where anyone can bring a claim on behalf of the United States government and receive a bounty." See also Manning v. Utils. Mut. Ins. Co., 254 F.3d 387, 394 (2d Cir. 2001) (referring to the Medicare Secondary Payer statute as creating "private attorneys general"). The

aspects of the Medicare Secondary Payer statute that are similar to a qui tam provision are that (1) it is based on the informer principle, in which the government relies on private persons with superior knowledge to discover the government's claim; (2) it increases the damages payable in order to motivate a private party to take action; and (3) the government expects to recoup part of the private party's recovery. In Manning, the Second Circuit relied on these kinds of similarities to conclude that the False Claims Act provided the most analogous statute of limitations to apply to § 1395y(b)(3)(A) claims. 254 F.3d at 394.

Even though the private right of action under § 1395y(b)(3)(A) shares these characteristics of a qui tam statute, it may not be a qui tam statute if Congress intended the plaintiff to act as a private plaintiff, asserting his own injury, rather than as a relator, asserting the government's injury. Despite language in some circuit-level decisions indicating that the private plaintiff can assert the government's rights under § 1395y(b)(3)(A), Glover v. Liggett Group, Inc., 459 F.3d 1304, 1307 (11th Cir. 2006) ("The MSP also creates a private right of action with double recovery to encourage private parties who are aware of non-payment by primary plans to bring actions to enforce Medicare's rights.") (emphasis added); Manning, 254 F.3d at 394 (stating that Medicare Secondary Payer statute allows individual citizens "to sue in order to right an economic wrong done to the government"), we conclude that the statute actually allows a private plaintiff to assert his own rights, not those of the government. See Frazer v. CNA Ins. Co., 374 F. Supp. 2d 1067, 1083 (N.D. Ala. 2005) ("[T]he MSPA does not create a cause of action which would permit a non-Medicare eligible worker's compensation claimant to bring such an action . . .").

Stalley argues that the statute cannot be read to contemplate that only a private party who was actually injured can assert the private right of action. Stalley argues that such a reading is impossible because no private plaintiff would ever have an injury which would both (1) be a cognizable injury for which the plaintiff could recover and (2) lead to a recovery which the government could recoup. Thus, Stalley

says that the only way the "private right of action" can help the government recoup money from primary payers is if it functions as a qui tam statute empowering a private person to assert the government's rights, rather than his own rights. Therefore, according to Stalley, a volunteer like himself, who has no relationship with the primary payer and has suffered no injury, can sue under the private right of action and recover double damages for the injury to the government. Catholic Health Initiatives' brief declines to identify a case in which the private right of action would be enforceable by an individual and lead to recoupment of Medicare expenses by the government; Catholic Health Initiatives tells us that we "need not even delve into this sort of speculation about the MSP statute's possible uses," but if there were truly no way that the private right of action would ever have any effect under Catholic Health Initiatives' interpretation, that would be a powerful argument that such an interpretation was wrong. To understand whether Stalley's argument is correct, we have to determine how the Medicare Secondary Payer statute as a whole was meant to work and how the private right of action fits within that framework.

Medicare is a federal program that provides health insurance for the elderly, the disabled, and renal patients. Blue Cross & Blue Shield of Tex., Inc. v . Shalala, 995 F.2d 70, 71 (5th Cir. 1993). In order to control the cost of Medicare, in 1980 Congress passed the Medicare Secondary Payer statute, 42 U.S.C. § 1395y(b), which provides generally that Medicare insurance is secondary to employer-provided group health insurance covering Medicare beneficiaries and that Medicare will not be liable for expenses which the private insurer ought to pay. See 1395y(b)(2). The statute provides that the private insurers cannot draw their policies to make an end run around the statute by excluding expenses that would be covered by Medicare if the person did not have group health insurance. § 1395y(b)(1). In addition to expenses covered by group health insurance, the statute also disclaims liability for expenses that should be paid under a workmen's compensation plan or under an automobile, liability, or no fault insurance policy, including a self-insurance plan. § 1395y(b)(2)(A). See generally Harvey L. McCormick, Medicare and Medicaid Claims and Procedures §

1:67 (Aug. 2007). Even though Medicare is not ultimately liable for these excluded expenses, the statute permits Medicare to pay those expenses up front, conditionally, and to require the liable insurer or other primary payer to reimburse Medicare for the moneys advanced. § 1395y(b)(2)(B)(i). The statute authorizes the government to sue any primary payer that has failed to reimburse Medicare for such conditional payments, and to collect double damages in such a suit. § 1395y(b)(2)(B)(iii). The government can also sue anyone that received payment from the primary payer with respect to expenses covered under Medicare, including the beneficiary himself, should he collect the payment but fail to reimburse the government. Id.; 42 C.F.R. § 411.24(g) (government has right of action against beneficiary that has received primary payment); United States v. Sosnowski, 822 F. Supp. 570, 574 (W. D. Wis. 1993) (granting government recovery from beneficiary from settlement with primary payer). The statute provides that the United States is subrogated to the rights of the Medicare beneficiaries against their insurer, to the extent of Medicare payments the government has made for the beneficiaries' expenses. § 1395y(b)(2)(B)(iv).

Congress added a private right of action to the Medicare Secondary Payer statute in 1986. Pub. L. No. 99-509, § 9319, 100 Stat. 1874 (1986) (codified as amended at 42 U.S.C. § 1395y(b)(3)(A)). Section 1395y(b)(3)(A) grants the Medicare beneficiary a private right of action for double damages against an insurer or other primary payer that fails to pay the amounts it owes on the insured's behalf. The parties do not point us to any legislative history explaining the purpose of the private right of action, nor have we found any legislative history directly explaining how the private right was meant to work. See H.R. Conf. Rpt. No. 99-1012, at 321 (1986), reprinted in 1986 U.S.C.C.A.N. 3868, 3966 (merely stating that the private right of action is "to enforce the provision for the aged"); S. Rpt. No. 99-348, at 140 (1986) (stating that obligation of primary payers "would be enforceable by private action or by the Federal Government"). Courts considering the provision have generally agreed that the apparent purpose of the statute is to help the government recover conditional payments from insurers or other primary payers. See, e.g., United

Seniors, 500 F.3d at 21-22 ("To facilitate recovery of these conditional payments, the MSP . . . (iii) creates a private cause of action with double recovery to encourage private parties to bring actions to enforce Medicare's rights.") (citation omitted); Manning, 254 F.3d at 396-97 & n. 8 ("The history of the MSP legislation is consistent with our view that the private right of action was created to save money for the Medicare system."); Frazer, 374 F. Supp. 2d at 1077 ("The legislation's incentive to bring a private lawsuit is clearly based in turn upon the subrogation right of the government to obtain a portion of the recovery.  The recovery of costs by Medicare is the primary purpose of the MSP."); see also Harris Corp. v. Humana Health Ins. Co., 253 F.3d 598, 606 (11th Cir. 2001) (per curiam) ("A private cause of action for double damages . . . serves Congress' interest in the fiscal integrity of the Medicare program by deterring private insurers primary to Medicare under the statute from attempting to lay medical costs at the government's doorstep.").  This is consistent with inclusion of the provision in The Omnibus Budget Reconciliation Act of 1986, which was intended to reduce government spending.  See Statement by President of the United States, 22 Weekly Compilation of Presidential Documents 1421 (Oct. 27, 1986), reprinted in 1986 U.S.C.C.A.N. 4073-74.  Additionally, as the Second Circuit pointed out in Manning, 254 F.3d at 397 n.8, when Senator David Durenburger introduced the President's Medicare proposals for 1986, which included the private right of action, he referred to the proposals as "health care cost reduction proposals." 132 Cong. Rec. 21935 (Aug. 15, 1986).

The thinking behind the statute is apparently that (1) the beneficiary can be expected to be more aware than the government of whether other entities may be responsible to pay his expenses; (2) without the double damages, the beneficiary might not be motivated to take arms against a recalcitrant insurer because Medicare may have already paid the expenses and the beneficiary would have nothing to gain by pursuing the primary payer; and (3) with the private right of action and the double damages, the beneficiary can pay back the government for its outlay and still have money left over to reward him for his efforts.

Stalley contends that the statute has to be a <u>qui tam</u> statute because under the payment procedures outlined by the statute, Medicare will pay the beneficiary's expenses when the primary insurer fails to pay, and as a result, the Medicare beneficiary will not have been injured by the primary payer's failure to pay and cannot recover anything in his own right. Stalley argues that if the Medicare beneficiary has not been injured, Congress must have intended the private right of action to allow the private plaintiff to sue on behalf of the government, the only injured party. Under Stalley's reasoning, the private right of action is merely an assignment of the government's public right.

We reject the assertion that a Medicare beneficiary could never have an injury of his or her own to vindicate by means of the private right of action. There are two scenarios in which a private plaintiff conceivably could bring suit under the Medicare Secondary Payer statute: either the insurer failed to pay and the government has not paid, or else the insurer failed to pay and the government did pay. In the first case, the plaintiff was obviously injured by the insurer's failure to pay, but the government has not yet paid any money. This would not appear to be the factual situation which the statute was created to remedy, because in this case, the government would have nothing to recover and therefore would not benefit from the services of the informer/plaintiff. If the first situation were the only one in which the beneficiary could sue, the private right of action would not save the government money. Moreover, in this first factual situation, there would be no need for the double damages incentive; if the government had not paid the expenses, the beneficiary would have an incentive to sue the primary payer even without double damages, to avoid having to pay the expenses him or herself.

In the second case, in which the primary payer failed to pay and the government has paid the expense, has the Medicare beneficiary been injured by the primary payer's failure to pay something the government paid anyway? Triad Hospitals and related defendants argue that a beneficiary whose primary payer refused to pay would have

damages even if Medicare paid the beneficiary's expenses because the beneficiary would have to pay Medicare co-payments and deductibles. But as Stalley points out, if those were the beneficiary's only damages, the beneficiary could only recover those amounts, not the amount that Medicare paid on its behalf. The co-payments and the deductible would be costs that are not covered by Medicare, so Medicare would not be entitled to recover those costs from the beneficiary. Thus, Stalley argues, if the Medicare beneficiary can only recover expenses not paid by Medicare, the private right of action would not help the government recoup anything and it would be completely ineffectual as an aid to Medicare's recovery efforts; this compels the conclusion, he says, that the private plaintiff must be able to assert the government's rights directly, because there is no way the plaintiff's assertion of its own rights would help the government collect any money.

We conclude that Stalley's reasoning is flawed. Congress must have intended that a Medicare beneficiary could sue its primary insurer for expenses Medicare had already paid. There was authority extant in several states when Congress enacted the private right of action in 1986 that a Medicare beneficiary could sue his private insurer and recover his expenses incurred, even if those expenses had already been paid by Medicare. See Holmes v. Cal. State Auto. Ass'n, 185 Cal. Rptr. 521, 524 (Cal. Ct. App. 1982); Black v. Am. Bankers Ins. Co., 478 S.W.2d 434 (Tex. 1972); Niles v. Am. Bankers Ins. Co., 229 So.2d 435 (La. Ct. App. 1969). To be sure, there was also authority reaching the opposite conclusion, e.g., Steffen v. Pac. Mut. Life Ins. Co., 442 S.W.2d 142, 144-45 (Mo. Ct. App. 1969) (policy was "not a policy of insurance in the usual sense but one of indemnity," meaning that insurer only agreed to reimburse insured for amounts insured was actually required to pay), but Congress could rationally have expected beneficiaries to be able to recover from their primary payers even if Medicare has made a conditional payment. Moreover, some courts have interpreted the § 1395y(b)(3)(A) private right of action to authorize a Medicare beneficiary's recovery of expenses that have already been paid conditionally by Medicare. Manning v. Util. Mut. Ins. Co., 254 F.3d 387, 391-92 (2d Cir. 2001) ("To

encourage compliance with [the primary payment] requirements, Congress has authorized a private cause of action and double damages against entities designated as primary payers that fail to pay for medical costs for which they were responsible, which are borne in fact by Medicare."); O'Connor v. Mayor & City of Baltimore, 494 F. Supp. 2d 372, 374 (D. Md. 2007) (plaintiff had standing under § 1395y(b)(3)(A) because he averred that he had suffered injury for which City owed but failed to pay worker's compensation and Medicare had been forced to pay his expenses); Collins v. Allstate Indem. Co., 626 A.2d 1162, 1166-67 (Pa. Super. Ct. 1993) (Medicare beneficiary had standing because "the plaintiffs allege a contractual right to the benefits owed, regardless of any independent claim to those benefits asserted by the United States."), aff'd, 660 A.2d 50 (Pa. 1995). The idea that Congress expected the beneficiary to be able to sue to vindicate his or her own contractual and tort interests is bolstered by the fact that the beneficiary's expenses will have only been paid "conditionally" by Medicare, § 1395y(b)(2)(B)(i), which leaves the beneficiary with less than a final settlement of his or her liability to the health-care providers.

On the other hand, the Third Circuit in Wheeler v. Travelers Ins. Co., 22 F.3d 534, 538-39 (3d Cir. 1994), dismissed for lack of standing a Medicare beneficiary's suit against her primary insurer because her expenses had been paid by Medicare. Similarly, in In re Guidant Corp., 484 F. Supp. 2d at 979-80, the plaintiff was a Medicare beneficiary allegedly harmed by the defendant's tort; she sued under § 1395y(b)(3)(A), but she conceded that she had no injury in fact from the alleged tortfeasor's failure to pay for her medical treatment because Medicare in fact paid for the treatment. The court dismissed her claim against the alleged tortfeasor for lack of standing because the Medicare beneficary was not injured in light of the fact that her expenses were paid. Id. at 980-81. Wheeler was distinguished in Brooks v. Blue Cross & Blue Shield, No. 95-405, reproduced as appendix at 116 F.3d 1365, 1377 (S.D. Fla. 1995), aff'd on other grounds, 116 F.3d 1364 (11th Cir. 1997), because Wheeler was brought under state insurance laws and not under the Medicare Secondary Payer statute.

Our study of the Medicare Secondary Payer statute convinces us that Congress contemplated that Medicare beneficiaries could recover double damages to vindicate their private rights when their primary payers fail to live up to their obligations, even if Medicare has made a conditional payment of the beneficiaries' expenses. Therefore, there is no need to read the statute as permitting a plaintiff to assert the public's rights in contravention of the plain language creating a private right of action. Accordingly, we reject Stalley's argument that Congress created the private right of action to permit private persons to assert the government's rights, rather than their own, for we conclude that Congress rationally could have intended § 1395y(b)(3)(A) to provide Medicare beneficiaries a cause of action against their defaulting primary payers, with the anticipation that a portion of the beneficiary's recovery would be paid to reimburse Medicare.

With the demise of his principal argument, Stalley's case quickly crumbles. Stalley relies on the regulations that require a beneficiary whose expenses have been paid by Medicare and who then receives a payment from a primary payer to reimburse Medicare. 42 C.F.R. §§ 411.20 & 411.37. He contends that these regulations indicate the statute is a qui tam statute since they show that the proceeds will be split between the plaintiff and the government. Far from showing that the proceeds result from the plaintiff asserting the government's rights, the regulations are consistent with the idea that the Medicare beneficiary asserts his or her rights against the primary payer and the government then asserts its own rights against the beneficiary, see § 1395y(b)(2)(B)(iii).

In sum, the private right of action provided by 42 U.S.C. § 1395y(b)(3)(A) is not a qui tam statute, and Stalley, who is a volunteer and who lacks any injury in fact, does not have standing to pursue such an action.

Stalley contends that the district court should have allowed him to replead, but in view of the fact that he has not indicated any amendment he could make that would

cure the defect in his complaint, the district court correctly denied permission to replead as futile.

Stalley's motion to strike the Appellees' appendices in No. 06-4121 is denied.

We affirm the district courts' dismissal of the complaints.

_____